UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

    Carthage Specialty Paperboard, Inc.,                 Case No. 18-30226
    and Carthage Acquisition, LLC,                   Chapter 11

                              Debtors.

---

    Lisbeth Hirschey, Urban C. Hirschey, and          Adv. Pro. No. 18-50010
    the estate of Lee T. Hirschey, by its
    fiduciary Deborah Bryant Hirschey

                              Plaintiffs,

v.

    Carthage Specialty Paperboard, Inc.,
    Carthage Acquisition, LLC, and U.S.
    Bank, N.A., successor in interest to HSBC
    Bank, as Escrow Agent,

                              Defendants.

---

Appearances:

William E. Brueckner, Esq.                                            *for Plaintiffs*
McConville, Considine, Cooman & Morin, P.C.
25 East Main Street
Rochester, NY 14614

Jerauld E. Brydges, Esq.                                               *for Defendants*
Harter Secrest & Emery LLP
1600 Bausch and Lomb Place
Rochester, NY 14604

**Memorandum-Decision and Order**

    Plaintiffs Lisbeth Hirschey, Urban C. Hirschey, and the estate of Lee T. Hirschey, by its fiduciary Deborah Bryant Hirschey, seek declaratory and injunctive relief declaring that Debtors Carthage Specialty Paperboard, Inc. and Carthage Acquisition, LLC have no interest in a $2,000,000 environmental escrow fund and directing U.S. Bank, N.A., as escrow agent to render

an accounting and release the funds to Plaintiffs.[2] Debtors counter that the funds should remain in escrow.

The Plaintiffs and Defendant-Debtors stipulated to the relevant material facts and joint exhibits[3] and filed competing motions for summary judgment. (Docs. 22, 23). For the reasons that follow, Plaintiffs' motion for summary judgment is granted and Debtors' motion is denied.

### Jurisdiction

In their pleadings, Plaintiffs and Debtor-Defendants recognize this court's jurisdiction to hear and decide this case. The court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a) and (b)(1). This memorandum-decision and order incorporates the court's findings and conclusions as permitted by Fed. R. Bankr. P. 7052.

### Factual and Procedural History

#### *The Agreements*

Since 1936, Plaintiffs operated Climax Manufacturing Company, a paper mill and manufacturer of paper products located on the banks of the Black River in Carthage, New York. Prior to May 2008, Plaintiffs owned all issued and outstanding shares of Climax Manufacturing Company. On May 16, 2008, Plaintiffs entered into an agreement whereby Plaintiffs agreed to sell their stock in Climax Manufacturing Company to Climax Acquisition, LLC.[4] Exhibit A, Stock Purchase Agreement (hereinafter the "Purchase Agreement").

Prior to entering into the Purchase Agreement, Buyer identified a September 2001 report issued by the New York State Department of Environmental Conservation, entitled *Final Report,*

---

[2] The original escrow agent was HSBC Bank USA, N.A., which has since been succeeded by U.S. Bank, N.A.
[3] See Joint Statement of Stipulated Facts (Doc. 18) (hereinafter "Stip.") with attached exhibits A-J (the "Exhibits").
[4] Climax Acquisition, LLC, the buyer in this transaction (hereinafter "Buyer"), subsequently transferred the shares of stock of Climax Manufacturing Company (hereinafter "Company") to Debtor Carthage Acquisition, LLC. The Company is now known as Carthage Specialty Paperboard, Inc., the other chapter 11 debtor and defendant in this adversary proceeding. Unless otherwise specified, all iterations of Debtor-Defendants, including the former Company are hereinafter referred to jointly as "Debtors."

2

*Evaluation of Toxic Contaminants in West Carthage/Carthage Municipal Westwaters* ("NYSDEC Report"). Exhibit C. The NYSDEC Report identified the Company as operating a mill that discharged polychlorinated biphenyls or "PCBs" to the local sewage treatment plant, which in turn discharges into the Black River. Stip. at ¶ 16.

In pertinent part, the Purchase Agreement contained indemnification provisions whereby Plaintiffs agreed to indemnify the Company (now the Debtors) for certain damages, including but not limited to "any Downriver PCB Claims." Purchase Agreement, Section 10.2(a)(ix). The Purchase Agreement defined "Downriver PCB Claims" in relevant part as:

> all Damages, including but not limited to the costs of investigation, remediation, clean up, and monitoring and any natural resource damages such as the loss of value from physical injury or destruction of land, fish, wildlife, biota, air, water, groundwater, drinking water supplies . . . arising from or related to the discharge of PCB-containing wastewater from the Company's facility located in West Carthage, New York either directly or indirectly, via the West Carthage Publicly Owned Treatment Works or otherwise, to the Black River.

Purchase Agreement, Section 1.2.

The Purchase Agreement limited the timeframe of Plaintiffs' exposure to indemnify the Debtors for Downriver PCB claims as follows:

> Section 10.2(a)(ix) shall survive the Closing for a period of fifteen (15) years after the Closing Date; provided, however, that in the event at any time during such fifteen (15) year survival period, DEC or the United States Environmental Protection Agency ("EPA") shall list the Black River, or any portion thereof, because of alleged PCB impact to the Black River in areas downriver from the Company's West Carthage facility, on the list of Inactive Hazardous Waste Sites Registry or the National Priorities List, then in either such event, the agreement of Sellers to indemnify Buyer pursuant to Section 10.2(a)(ix) shall survive until the expiration of the applicable period during which either DEC or EPA, as applicable, can make a claim against, or otherwise seek recovery from, the Company or Buyer as a potentially responsible party with respect to any matters that would constitute downriver PCB Claims hereunder.

Purchase Agreement, Section 10.1(c)(iii).

Contemporaneous with the execution of the Purchase Agreement, the parties also executed an Environmental Escrow Agreement. Exhibit B ("Escrow Agreement" and together with the

Purchase Agreement, the "Agreements"). Under the Escrow Agreement, the parties agreed to withhold $2,000,000 from the total purchase price which would be deposited into an escrow account. The Escrow Agreement stated that these funds were to serve, "as a partial source for the payment of certain indemnified claims that may arise pursuant to Section 10.2(a)(ix) of the Purchase Agreement." Escrow Agreement, ¶ 2 of preamble.

The Escrow Agreement directed the escrow agent to release funds: 1) upon joint written instruction of Plaintiffs and Debtor-Defendants; 2) upon a written notice from Debtor-Defendants to release certain funds, unless Plaintiffs provided a written objection within 30 days after the escrow agent received any such notice; 3) in accordance with a final order, decree or judgment in a proceeding to which Plaintiffs and the Debtor-Defendants are parties; or 4) upon termination of the agreement. Escrow Agreement, Section 3(a)(i-iv). Under these provisions, the Escrow Agreement would terminate after ten years unless there existed before that date "any outstanding and unresolved claim" for indemnification resulting from Downriver PCB Claims. Escrow Agreement, Section 3(b).[4]

### Environmental Protection Agency Actions

On or around October 2010, the United States Environmental Protection Agency ("EPA") designated a segment of the Black River as a site on the National Priorities List, which included a three mile stretch that begins just below the Black River's dam at Carthage and West Carthage, New York and extending downstream. Stip. at ¶ 18. Discharges of wastewater from the mill to this designated site continue to this day. Stip. at ¶ 19.

---

[4] The Escrow Agreement is dated May 16, 2008. Escrow Agreement ¶1 of preamble. As such, the ten-year anniversary or the "Survival Date" is May 16, 2018.

4

Five years later, within the ten-year term of the Escrow Agreement, the EPA sent a *Request for Information Pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, regarding the Black River PCBs Superfund Site* pursuant to section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act (a "104(e) Request" pursuant to "CERCLA"). Exhibit H. Since 2016, the EPA has stated that remedial investigation and a feasibility study regarding this site are under way, but EPA has not proposed a remedial plan or stated whether remedial action will be required. Stip. at ¶ 27-29. Apart from the 104(e) Request, the EPA has not made a demand or required Debtors to bear any costs for remediation, nor has EPA filed a complaint. Stip. at ¶ 30-32.

### *Debtors'−Plaintiffs' Correspondence*

Beginning with the designation of the site on the National Priorities List, there was an exchange of letters disputing the disposition of the escrow funds. Debtors notified Plaintiffs of the designation and their intent to both seek indemnification for all resulting damages and direct the escrow agent to retain the escrow funds until resolution of indemnification claims.

Three and a half years later and prior to receipt of the 104(e) Request, Debtors wrote a letter to the escrow agent and asserted a Notice of Claim under the Escrow Agreement. The escrow agent was directed not to release any funds absent receipt of joint instructions. Exhibit F.

In response, and prior to the expenditure of funds in the defense of any claims, Plaintiffs sent a letter to the escrow agent disputing Debtors' assertion that a claim for indemnification existed and informing Debtors that Plaintiffs intended to assume the defense of any such claim. Exhibit G. Thereafter, Debtors incurred $4,400 of expenses in responding to the 104(e) Request.[6] Stip. at ¶ 33-34.

---

[6] Debtors initially argued that the $4,400 they incurred after receipt of Plaintiffs' notice constituted an outstanding claim for indemnification. Debtors later conceded that that "Plaintiffs may not be liable" for these expenses. Doc.

5

On April 26, 2018, Debtors' counsel notified the escrow agent that outstanding and unresolved claims existed and instructed the escrow agent to retain all escrow funds. Exhibit I.

Plaintiffs' counsel responded by demanding that Debtors join in a request of the court to authorize the release of all escrow funds to Plaintiffs. Exhibit J. When no joinder was forthcoming, Plaintiffs commenced the instant Adversary Proceeding.

## Discussion

### *Summary Judgment Standard*

Fed. R. Civ. P. 56, as incorporated by Fed. R. Bankr. P. 7056, states that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Where opposing parties have submitted motions for summary judgment, "the court must evaluate each party's motion on its merits and determine whether either is entitled to judgment as a matter of law." *Standard Gen. L.P. v. Travelers Indem. Co. of Conn.*, 261 F.Supp.3d 502, 506 (S.D.N.Y. 2017) (citing *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017)).

With no facts in dispute and only legal issues presented, the matter is ripe for summary judgment as a matter of law.

### *Standard for Contract Interpretation*

Plaintiffs and Debtor-Defendants agree that New York law governs interpretation of the Agreements. Purchase Agreement. Section 11.8.

"The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562,

---

23-1 at p. 23. Debtors' request for reimbursement of this amount will be treated as abandoned. To the extent the parties seek this court's determination of the parties' respective liability for future 104(e) response expenses yet to be incurred, the court declines to do so as the issue is not ripe for determination.

569 (2002). A number of critical terms are undefined in the Agreements. Where terms are undefined, the court must attempt to divine the plain meaning of the term. *See Graev v. Graev*, 11 N.Y.3d 262, 271-72 (2008). Other provisions of the Agreements appear to conflict with each other. If the court "can construe the two provisions in a way that renders both operative and compatible, [it] must do so." *Israel v. Chabra*, 537 F.3d 86, 99 (2d Cir. 2008) (interpreting New York law). And where, as here, there is more than one contract governing the disposition of this matter, the court will read and interpret the contracts together. *Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 233 (2d Cir. 1991) (interpreting New York law) ("[I]nstruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together.")

Neither party has offered any extrinsic evidence that would affect how the Agreements should be interpreted. In such instance, the court may resolve any ambiguity in interpretation as a matter of law. *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) (interpreting New York law). Ambiguity standing alone, however, is not enough to preclude summary judgment. *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir. 1994) (applying New York law).

***Intent of the Parties***

To determine the intent of the parties as to when the Escrow Agreement would terminate, the court looks primarily to Section 3(b) of the Escrow Agreement. This provision directs the Plaintiffs and Debtor-Defendants to instruct the escrow agent to release any undistributed funds to Plaintiffs after May 16, 2018–unless, at that time, there was, "any outstanding and unresolved claim . . . for indemnification" by Debtors concerning Downriver PCB Claims. "Outstanding and unresolved claim . . . for indemnification" is not a defined term in the Agreements, nor are "outstanding," "unresolved," or "claim." Accordingly, the court must construe the meaning of

"outstanding and unresolved claim . . . for indemnification" by reference to its plain meaning and to other provisions found within the four corners of the Agreements. *See Dryden Mut. Ins. Co. v. Goessl*, 117 A.D.3d 1512, 1514 (4th Dept. 2014).

Debtors assert that two alternative bases are present, each of which represents an "outstanding and unresolved claim." These include: (i) listing of the facility on the National Priorities List by the EPA and (ii) receipt of the 104(e) Request. The court must determine whether the parties intended that either of these occurrences within ten years would require the funds to remain in escrow.

### *Designation on the National Priorities List*

**General Indemnification versus Specific Escrow Release Conditions**

The Agreements differentiate between Plaintiff's general indemnification obligations and the specific conditions for release of the escrow funds. The general indemnification provisions in the Purchase Agreement are broad. *See generally* Purchase Agreement, Section 10.2. Certain of Plaintiffs' obligations to indemnify the Debtors survive indefinitely. *See* Purchase Agreement Section 10.1(c). The parties agreed that indemnification would survive if, during the first 15 years of the Purchase Agreement, a certain portion of the Black River were listed on the EPA's National Priorities List. *See* Purchase Agreement, Section 10.1(c)(iii).

This language is telling, as it demonstrates that the parties contemplated the instant scenario, where the facility could be listed on the National Priorities List after the execution of the Agreements, but before expiration of the 15-year period for general indemnification. The plain language of the Purchase Agreement indicates that in the instant circumstances, the Debtors would be afforded an extension of time for general indemnification "until expiration of the applicable period during which either DEC or EPA . . . can make a claim against . . ." the Debtors. *Id.*

8

Nowhere in the Purchase Agreement does it state that the National Priorities List designation would constitute an outstanding and unresolved claim for indemnification. Instead, such designation is no more than an antecedent event that would extend Plaintiffs' potential liability for general indemnification.

On the other hand, the Escrow Agreement, does not address general indemnification. Instead, it governs release of the escrow funds that have been earmarked to indemnify the Debtors for Downriver PCB claims. Escrow Agreement, ¶2 of preamble. These earmarked funds were only to be held through the ten-year term of the Escrow Agreement in the absence of then outstanding and unresolved claims for indemnification. Escrow Agreement, Section 3(b). It is evident that the parties contemplated that the EPA could list the facility on the National Priorities List without immediately demanding remediation. In such event, Debtors would have the remedy of extending the *general indemnification* provisions contained in the Purchase Agreement. No similar language appears in the Escrow Agreement. This omission supports Plaintiffs' argument that the parties did not intend a designation on the National Priorities List to trigger the retention of funds under the Escrow Agreement. If the parties so intended they would have said so in the Escrow Agreement , similar to the Purchase Agreement. But the Purchase Agreement does not contain such a provision. Debtors essentially ask that the court read into the Escrow Agreement an additional term, which the court declines to do.

Plaintiffs admit that the National Priorities List designation extended the period of time under which Debtors can assert a claim for general indemnification for Downriver PCB Claims and that they remain liable for the same under the Purchase Agreement. Debtors' claim for indemnity may ultimately be asserted under the indemnity provisions of the Purchase Agreement, but not under the more limited terms of the Escrow Agreement.

**Rule of the Last Antecedent**

Downriver PCB Claims are defined to include the term "Damages." Section 1.2 of the Purchase Agreement defines Damages as:

> all costs, damages, Liabilities, losses, fines, penalties, obligations, claims, disbursements or expenses (including, but not limited to interest and reasonable legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement) **that are actually imposed or otherwise actually incurred or suffered by the indemnified person**, but shall not include consequential or other special damages, unless such consequential or special damages are owed to a third party.

Purchase Agreement, Section 1.2 (emphasis supplied).

Liabilities are in turn defined as:

> any and all debts, losses, liabilities, offsets, claims, damages, fines, obligations, payments and accounts payable (including, without limitation, those arising out of any award. demand, assessment, settlement, judgment or compromise relating to any Action), and accruals for out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and expenses incurred in investigating, preparing or defending any Action), whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due.

*Id.*[7]

Plaintiffs emphasize that Damages must be "actually imposed or otherwise actually incurred" and that to allow a National Priorities List designation to constitute claims for Damages would be to inappropriately read this provision out of the Purchase Agreement, since no monetary damages are incurred by such designation. Debtors rebut Plaintiffs' interpretation of the language by invoking the "rule of the last antecedent" ("Rule"). The Rule provides that when a list is followed by "a limiting clause or phrase . . . [it] should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. U.S.*, 136 S.Ct. 958, 963 (2016) (quoting *Barnhart v. Thomas*, 124 S.Ct. 376, 380 (2003)). The Rule is usually applied to statutory

---

[7] "Liabilities" and "Damages" will hereinafter be used as defined in the Purchase Agreement.

10

construction but has been applied to contract interpretation as well. *Lloyd v. J.P. Morgan Chase & Co.*, 791 F.3d 265, 271 (2d Cir. 2015) (applying the Rule to a contractual provision). Debtors argue that the phrase "that are actually imposed or otherwise actually incurred" should only modify the final word in the list: "expenses." If this were the case, Debtors' argument that the definition of "Damages" includes even unknown and unliquidated claims would be substantially stronger.

The Rule, however, is "not an absolute and can assuredly be overcome by other indicia of meaning." *Barnhart* 124 S.Ct. at 380. It is limited by the countervailing "rule of the series qualifier," which provides that, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series," a modifier at the end of the list "normally applies to the entire series." *Lockhart* 136 S. Ct. at 970.

Here, the word "expenses" is followed by a long parenthetical section. The content of the parenthetical section only modifies the word "expenses." Once the parenthetical section has closed, the language returns to modifying the entire list that preceded the parenthetical section. If the parties had meant to apply the phrase "that are actually imposed" to modify only "expenses," they would have included the phrase within the parenthetical section, yet they chose not to. For this reason, the court finds that the phrase "that are actually imposed" modifies all terms listed in the definition of "Damages." This construction limits all Damages to those that are "actually imposed or otherwise actually incurred."

**Outstanding and Unresolved Claims for Indemnity**

Debtors' reliance upon the broad definition of Damages and Liabilities is misplaced. The Escrow Agreement provides that escrow funds would be retained if there is "any outstanding and unresolved claim" for Damages related to Downriver PCB Claims. Therefore, the question is whether there has been any outstanding and unresolved claim for indemnification at all.

To accord "outstanding and unresolved claim . . . for indemnification" its plain and ordinary meaning, the court looks to general New York State law principles. A claim "generally accrues when the indemnitee actually suffers a loss." *Continental Cas. Co. v. Stronghold Ins. Co., Ltd.*, 77 F.3d 16, 19 (2d Cir. 1996) (citing *Steen v. Niagara Fire Ins. Co.*, 89 N.Y. 315, 325 (1882))[8]. Parties are, however, free to vary this rule by contract.[9] The court finds that a National Priorities List designation allows a claim for indemnification to survive pursuant to the general indemnification provisions of the Purchase Agreement. Nowhere in the Agreements, however, does it state that a claim for indemnity accrues by virtue of being listed on the National Priorities List. The parties therefore have not varied the general rule that actual loss is required for a claim to accrue.

For all of the foregoing reasons, the court finds that the parties did not intend for the National Priorities List designation to constitute an outstanding and unresolved claim for indemnification as contemplated under the Escrow Agreement.

### *104(e) Request*

Debtors also assert that the 104(e) Request sent by the EPA constituted the accrual of a "claim." Exhibit H. This argument is similarly unavailing. Debtors rely on *Anderson Bros. v. St. Paul Fire & Marine Ins. Co.*, 729 F.3d 923 (9th Cir. 2013) where the Ninth Circuit found that the issuance of a 104(e) request constituted a "suit" under Oregon law. *Id.* at 931. However, the Oregon law specifically defined "suit" as including, "a writing in which the EPA directs, requests or agrees that a party take action with respect to contamination within the state. . ." *Id.* Debtors

---

[8] *See also Buffalo Color Corp. v. Alliedsignal, Inc.*, 139 F. Supp. 2d 409, 422 n. 8 (W.D.N.Y. 2001) (interpreting whether indemnification covered CERCLA liability or traditional damage claims by third parties).
[9] "An express contract for indemnity, however, remains a contract. Hence the parties are free, within limits of public policy, to agree upon conditions precedent to suit." *Sompo Japan Ins. Co of Am. v. Norfolk Southern Ry. Co.*, 762 F.3d 165, 188 (2d Cir. 2014) (quoting *Continental Cas. Co.* 77 F.3d at 19).

have failed to cite any such law in New York. Moreover, a 104(e) Request is only a company's "first warning about *potential* involvement at a new Superfund site." James T. Price, *Responding to EPA Information Requests*, 5-FALL Nat. Resources & Env't 13 (1990) (emphasis supplied). The court concludes that the 104€ Request does not rise to the level of an outstanding and unresolved claim for indemnification which would extend the Escrow Agreement.

## Counterclaim Disposition

Debtors filed a counterclaim that essentially asks the court to find against Plaintiffs and is a "mirror-image" of the contract interpretation approach of Plaintiffs. Doc. 9. The court notes that Plaintiff did not file any reply to the counterclaim. Fed. R. Bankr. P. 7012 provides in relevant part that "F.R.Civ.P. applies in adversary proceedings ..." Fed. R. Civ. P. 12(f) provides that "the court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f)(1) further provides that the court may act on its own. "[W]hen a counterclaim merely restates the issue as a 'mirror image' to the complaint, the counterclaim serves no purpose." *Interscope Records v. Kimmel*, 2007 WL 1756383, at *2 (N.D.N.Y. June 18, 2007) (quoting *F.D.I.C. v. Project Dev. Corp.*, 819 F.2d 289, at * 3 (6th Cir. 1987)).

A number of district court cases in the Second Circuit have dismissed such "mirror-image" claims. *See Ferring B.V. v. Fera Pharmaceuticals, LLC*, 2014 WL 4829053, at *4 (E.D.N.Y. Aug. 13, 2014) (citing *Interscope Records* along with other S.D.N.Y. and E.D.N.Y. cases). Courts have found that counterclaims are redundant where, as here, a ruling on the merits of plaintiffs' claim would render the counterclaim moot. *Barnett v. Platinum Equity Capital Partners II, L.P.*, 2017 WL 3190654, at *5 (W.D. Pa. July 27, 2017) ("an adverse ruling on plaintiff's request for

declaratory relief . . . would grant the counterclaim's requested relief.") (citing *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 674 F.Supp.2d 562, 566 (D. Del.2009)).

Debtors' counterclaim is mooted by this decision and shall be dismissed.

## Conclusion

Based on the foregoing and in accordance with the Agreements, the court concludes that by its terms the Escrow Agreement is terminated and that Debtors' estates have no interest in the funds. A separate judgment shall issue in accordance with Fed. R. Bankr. P. 7058 dismissing Debtors' counterclaim and directing U.S. Bank, N.A. as Escrow Agent to render an accounting and release the escrow funds to Plaintiffs.

So Ordered.

Dated: June 3, 2019
      Syracuse, New York

Margaret Cangilos-Ruiz
United States Bankruptcy Judge